## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SANDRA JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 17-882-MN-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **REPORT AND RECOMMENDATION**

## **I.     INTRODUCTION**

Plaintiff Sandra Jones ("Jones") filed this action on July 5, 2017 against defendant Nancy

A. Berryhill, the Acting Commissioner of the Social Security Administration (the

"Commissioner"). Jones seeks judicial review pursuant to 42 U.S.C. § 405(g) of the

Commissioner's May 15, 2014 final decision, denying Jones' claim for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act (the "Act"), 42 U.S.C. §§ 401–434 and §§ 1381–1383f. The court has jurisdiction

over the matter pursuant to 42 U.S.C. § 405(g).

Currently before the court are Jones's and the Commissioner's cross-motions for

summary judgment. (D.I. 13; D.I. 17) Jones asks the court to remand her case for further

administrative proceedings. (D.I. 14) The Commissioner requests the court affirm the

Administrative Law Judge's ("ALJ") decision. (D.I. 18 at 16) For the reasons set forth below,

the court recommends granting-in-part and denying-in-part Jones's motion for summary

judgment (D.I. 13), and granting-in-part and denying-in-part the Commissioner's cross-motion

for summary judgment (D.I. 17). Additionally, it is recommended that the case be remanded for further administrative proceedings as outlined *infra*.

## II.    BACKGROUND

### A. Procedural History

Jones filed an application for DIB on January 28, 2013,[1] and an application for SSI on January 31, 2013.[2] (Tr. at 201, 203) In both applications, Jones claimed a disability onset date of January 1, 2010. (*Id.*) Her claim was initially denied on July 10, 2013, and denied again after reconsideration on May 15, 2014. (*Id.* at 81, 94, 117, 137) Jones then filed a request for a hearing, which occurred on July 12, 2016. (*Id.* at 179) On March 30, 2017, Administrative Law Judge William A. Kurlander issued an unfavorable decision, finding that Jones was not disabled under the Act because she retained the residual functional capacity ("RFC") to perform light work[3] including past relevant work as a phlebotomist. (*Id.* at 19-37) The Appeals Council subsequently denied Jones's request for review on May 9, 2017, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 3-8) On July 5, 2017, Jones brought a civil action in this court challenging the ALJ's decision. (D.I. 2) On December 27, 2017, Jones filed a motion

---

[1] The ALJ noted that Jones filed this application on January 27, 2013, but the application is dated January 28, 2013. (Tr. at 19, 201)

[2] Prior to this case, Jones filed for DIB and SSI on November 2, 2010 and the applications were denied on March 21, 2011. (Tr. at 119) Jones did not file for appeal and therefore the unfavorable determinations became administratively final. (*Id.* at 19) Thus, the request for benefits between the dates of January 1, 2010, and March 21, 2011, was denied based on administrative *res judicata*. (*Id.* at 20) Jones does not challenge the denial of benefits within the *res judicata* time period.

[3] The ALJ defined "light work" according to 20 C.F.R. § 404.1567(b) and 416.967(b) with the exception of climbing ladders, ropes, or scaffolds, kneeling, or crawling; no more than occasional postural activities in all other areas; and limitations on pushing or pulling with the bilateral lower extremities and no more than frequent fingering with the dominant upper extremity. (Tr. at 28)

2

for summary judgment, and on April 30, 2018, the Commissioner filed a cross-motion for summary judgment. (D.I. 13; D.I. 17)

## B. Medical History

The ALJ concluded that Jones has the following severe impairments: Raynaud's syndrome, rheumatoid arthritis, obesity, degenerative joint disease in her left knee with total knee replacement, neck disorder, degenerative changes in her right hand, pain disorder, and back disorder. (*Id.* at 23) Jones was born on January 3, 1955, and was fifty-five years old on her alleged onset date. (*Id.* at 20) Jones graduated and completed a nursing degree in July 2010. (*Id.* at 234) She has a prior work history as a dietary aide, phlebotomist, library aide, office assistant, and trainee. (*Id.* at 241) Due to financial strain, Jones returned to work as a phlebotomist from June 30, 2013 to September 10, 2014, but has not worked since. (*Id.* at 55, 268)

### a. Physical Impairments

#### i. Neck and Back Injuries

Jones was in a motor vehicle accident on November 28, 2007, and has experienced neck and back pain since then. (*Id.* at 395) An MRI of Jones's spine dated November 17, 2009 noted multilevel moderate cervical spondylitic changes with degenerative disk change. (*Id.* at 400) Dr. Bandera noted moderate to severe cervical spondylosis and pain in Jones's neck and back that increased with activity. (*Id.* at 392-393) By May 2012, Dr. Bandera observed the limited range of motion of her neck and back. (*Id.* at 390) A radiology report dated September 12, 2016 highlighted "extensive multilevel degenerative changes" with "disc space narrowing" and "severe osteoarthritis throughout the cervical spine." (*Id.* at 902)

3

### ii. Knee Pain

Jones also suffered from left sciatic pain and arthritic left knee pain since April 2010. (*Id.* at 368) At a June 7, 2010 appointment, Dr. Burday noted there was a purple discoloration and prominence of her left knee, in addition to pain with palpation. (*Id.* at 363) Jones stated her knee pain was "excruciating." (*Id.* at 388) By February 2011, Jones made an appointment to see an orthopedic doctor at St. Francis. (*Id.* at 601) She told Dr. Burday that she fell and hit her forehead when her left knee gave out. (*Id.*) On April 20, 2011, Dr. Burday noted that Jones had a bony left knee that was slightly increased in size as compared to her right knee. (*Id.* at 591) Dr. Burday further recorded that the orthopedic doctor at St. Francis advised that Jones pursue total knee replacement surgery on her left knee, but Jones wished to postpone this for several months. (*Id.*)

At her November 2012 appointment, Jones reported that she could not have the necessary knee surgery due to expenses. (*Id.* at 513, 511) She continued to report financial problems precluding her surgery, but continued to suffer from leg cramps daily, knee pain, and arthritic pain in her legs. (*Id.* at 505, 676) In January 2014, Jones described how she fell at work when her right leg gave out and once more at her house. (*Id.* at 780) Dr. Burday noted that Jones was walking with a prominent limp. (*Id.* at 782) Jones complained of back pain, joint pain, and loss of strength. (*Id.*)

On September 11, 2014, Jones finally received her left total knee replacement surgery. (*Id.* at 944-947). In the months that followed, she reported stiffness and some pain. (*Id.* at 986-988) By February 2015, Dr. Johnson noted that Jones's condition was "markedly improved." (*Id.* at 985) Jones reported no pain associated with her left knee by September 2015. (*Id.* at 984)

4

At a follow-up appointment in October 2016, Jones claimed most of her pain was in the right knee and she was attempting to lose weight before having her right knee replaced. (*Id.* at 983)

### iii. GERD & Obesity

Jones had gastric band surgery in 2006. (*Id.* at 446) In July 2012, Dr. Merriman started seeing Jones about her persistent symptoms of chest pain and heartburn. (*Id.* at 466, 606) Dr. Merriman described these symptoms as moderate to severe, and noted significant reflux esophagitis with some mild atypia and a significant hiatal hernia. (*Id.* at 466) Despite her band being loosened in September 2012, Jones experienced persisting GERD symptoms. (*Id.* at 409, 623, 631, 637) A subsequent endoscopy with Dr. Merriman revealed dilation of the lower third of her esophagus and a medium hiatal hernia. (*Id.* at 445) She had the gastric band removed in January 2013 and experienced post-operative anemia which required a blood transfusion, but otherwise recovered. (*Id.* at 444, 446) Following removal of the gastric band, Jones reported some abdominal pain, but her symptoms were much improved. (*Id.* at 505, 607, 612)

### iv. Raynaud's Syndrome & Rheumatoid Arthritis

In May 2013, Jones complained that her hands were cold, numb, tingling, and turning white. (*Id.* at 694) On January 10, 2014, Dr. Burday noted that there was a deformity regarding Jones's right thumb extension, and that her right hand was cyanotic with whiteness of several fingers. (*Id.* at 782) In November 2014, Dr. Schwartz diagnosed Jones with Raynaud's syndrome and rheumatoid arthritis and oversaw her treatment for the next several years. (*Id.* at 873-874, 876-877, 880, 884, 886)

### b. Mental Impairments

On March 19, 2011, Jones was seen by Dr. Waid, a consultative examiner who diagnosed her with major depression with suicidal ideation and psychotic features. (*Id.* at 403) He

concluded that Jones' impairments of her abilities to carry out instructions under ordinary supervision, cope with pressures of ordinary work, and perform routine, repetitive tasks under ordinary supervision were "moderately severe." (*Id.* at 404) He assessed her ability for sustained work performance and attendance in a normal work setting was severely impaired. (*Id.*)

After meeting Dr. Waid, Jones was reportedly "somewhat down" and "somewhat anxious," but there were no subsequent mental health reports mirroring the symptoms Dr. Waid observed. (*Id.* at 567-568, 570, 583) Aside from these occasional mood disturbances, Jones did not complain of any mental health issues until March 7, 2012, when Dr. Burday noted a "depressed affect" with the stress of taking care of her ALS patient. (*Id.* at 546, 548, 550-551, 554, 556, 578, 591)

Jones met with Dr. Wallace on March 26, 2012 regarding her depression. (*Id.* at 559) Jones stated she that nearly every day, she: (1) had little interest or pleasure in doing things; (2) felt down, depressed or hopeless; (3) had trouble falling asleep, staying asleep, or sleeping too much; (4) felt tired or had little energy; and (5) had poor appetite or overeating. (*Id.*) Overall, she was given a total score of 20, resulting in the conclusion that her depression was severe. (*Id.*) While Dr. Wallace noted that her depression was not as bad as it had been, Jones still was very depressed. (*Id.* at 560) Additionally, Dr. Wallace observed that Jones had no suicidal ideation or desire to hurt others. (*Id.* at 561)

Jones had a follow-up appointment with Dr. Wallace on April 11, 2012. (*Id.* at 531) She stated she felt "relieved and less stressed," but presented a "depressed affect and little eye contact." (*Id.* at 531-532) Dr. Wallace noted not much change in Jones's depression and reported that Jones denied suicidal ideation. (*Id.* at 533) Dr. Wallace increased the dosage of

6

Zoloft. (*Id.*) At her next appointment on May 25, 2012, Jones stated "she does not feel sad anymore." (*Id.* at 540)

Jones later met with Dr. Burday on July 11, 2012, where she stated she was depressed and anxious after failing her nursing boards. (*Id.* at 522, 524) Following this meeting, she did not complain of any mental health issues for several months and records note that she was "alert and cooperative, [had] normal mood and effect [with] normal attention span and concentration." (*Id.* at 513, 518, 528, 702, 716, 722) Upon meeting Dr. Burday on February 6, 2013, she complained of depression with "funky" periods and Dr. Burday documented her occasional depression. (*Id.* at 505, 507) The remainder of her medical records through January 10, 2014 indicate no mental health complaints. (*Id.* at 671, 678, 696, 782)

A state agency psychological review by Dr. Folkers in May 2013, recounts that "psych[ological] observations have been unremarkable and [claimant] reported only occasional depression at last [observation] on [February 6, 2013]." (*Id.* at 75) Dr. Folkers, therefore, deemed Jones's mental health impairment "non-severe." (*Id.*) His opinion was affirmed by Dr. King in May of 2014. (*Id.* at 128)

### C. Hearing Before the ALJ

#### a. Jones's Testimony

Jones acknowledged that she worked in 2013 and 2014 because she was in foreclosure. (*Id.* at 60) She testified that she stopped working as a phlebotomist in 2014 because she could not stand or walk. (*Id.* at 55) Despite having a total knee replacement of her left knee, she said her "knees hurt so bad [she] could barely even walk to [her] car." (*Id.*) She has not pursued total knee replacement on her right knee because she said "it [was] the most awful operation [she] ever had in [her] life" and "the thought of going through that again depresses [her]." (*Id.* at 63-

64) Jones testified that she sometimes uses an ankle brace that resembles an ACE bandage on her right "polio leg." (*Id.* at 58) She stated that she had polio when she was approximately four years old and consequently received ankle surgery at a young age. (*Id.* at 59) Jones testified that she falls unpredictably. (*Id.* at 63-64) Jones also testified that all of her fingers were numb, and attributed this sensation to Raynaud's syndrome. (*Id.* at 56-57) Because of this numbness in her fingers, she required a heat pack to do her work. (*Id.* at 57) Jones testified that she loved phlebotomy, but cautioned that she was a danger to herself and her patients. (*Id.* at 57, 60)

Jones testified that she sometimes drives a car, if needed. (*Id.* at 59) Jones is 5'1" and 170 lbs. (*Id.* at 64) She stated that she was attempting to eat better, but was not able to exercise much, apart from "chair exercises." (*Id.*)

### b. Vocational Expert Testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> Please assume a hypothetical individual of the claimant's age and education, and with the past work that you described. Further, please assume that the hypothetical individual is capable of performing work at the light exertional level, with the following additional limitations. There's no more than occasional postural activity, but there's no climbing of ladders, ropes, and scaffolds; no kneeling and no crawling. There's no more than occasional use of ramps and stairs. There's no pushing or pulling with the bilateral lower extremities, and there's no more than frequent fingering with the dominant upper extremity. That would be with the right hand. Is the past work available?

(*Id.* at 66-67) The VE testified that because the past work of phlebotomist would require "constant fingering," the past work would not be available to the hypothetical individual. (*Id.* at 67) The VE further explained that upon eliminating the fingering requirement, the past work would then become available. (*Id.*) The ALJ inquired whether adding a "sit/stand" option would make the previous relevant work available. (*Id.* at 68) The VE replied that such an option would still not make past work available. (*Id.*) In addition, the VE testified that "based upon [her]

8

experience as a vocational counselor and actually seeing the job [of a phlebotomist] performed," her opinion was consistent with the Dictionary of Occupational Titles (the "DOT"), with the exception that the DOT did not address a sit/stand option. (*Id.*)

### D. The ALJ's Findings

Based on the factual evidence in the record and the testimony of Jones and the VE, the ALJ determined that Jones was not disabled under the Act for the relevant time period from January 1, 2010, the alleged onset date of her disability, through March 30, 2017, the date of the decision. (*Id.* at 22-37) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2. The claimant engaged in substantial gainful activity (SGA) during the following periods: from June 30, 2013, to September 10, 2014 (*See generally* 20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. However, there have been continuous 12-month periods during which the claimant did not engage in substantial gainful activity. The remaining findings address those periods.

4. The claimant has the following severe impairments: Raynaud's Syndrome; Rheumatoid Arthritis; Obesity; Degenerative Joint Disease, left knee, with total knee replacement; Neck Disorder; Degenerative Changes, right hand; Pain Disorder; and Back Disorder. (*See generally* 20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medcially equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (*See generally* 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: (i) Never climb ladders, ropes, or scaffolds, and no kneeling or crawling; (ii) No more than occasional postural activities in all other areas; (iii) Never push or pull with the bilateral lower extremities; and (iv) No more than frequent fingering with the dominant upper extremity.

9

7. The claimant is capable of performing past relevant work as a Phlebotomist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (*See generally* 20 CFR 404.1565 and 416.965).

8. The claimant has not been under a disability, as defined in the Social Security Act from January 1, 2010, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(*Id.* at 22-37)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal

Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

> [a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g)

affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 42 U.S.C. § 423(a)(1)(D) (2015). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires

12

the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the RFC to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001) (internal quotations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age,

education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

### B. Whether the ALJ's Decision is Supported by Substantial Evidence

On March 30, 2017, the ALJ found Jones was not disabled within the meaning of the Act from the alleged onset date of January 1, 2010 through the date of the hearing. (Tr. at 19-37) The ALJ concluded that, despite Jones's severe impairments (Raynaud's syndrome, rheumatoid arthritis, obesity, degenerative joint disease in her left knee with total knee replacement, neck disorder, degenerative changes in her right hand, pain disorder, and back disorder), she had the RFC to perform light work[4] and perform jobs that exist in significant numbers in the national economy. (*Id.* at 28-35)

Jones asserts four main arguments on appeal: (1) the ALJ was derelict in his duty to her as an unrepresented claimant, (2) the ALJ's credibility determinations were not supported by substantial evidence, (3) the ALJ erred by failing to address her mental limitations in determining her RFC, and (4) the ALJ failed to resolve a conflict between the VE's testimony and the DOT regarding Jones's manipulative limitations.

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

### 1. The ALJ's Duty to Unrepresented Claimant

Where a plaintiff is unrepresented by counsel, "the ALJ has an enhanced duty to fully develop the record and hold a full and fair hearing." *Sanchez v. Comm'r of Soc. Sec.*, 271 F. App'x 230, 233 (3d Cir. 2008). In such circumstances, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (quoting *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978)). Whether the ALJ failed to adequately develop the record is analyzed case by case, and the essential inquiry is whether evidentiary gaps exist in the record which result in prejudice to the claimant. *Hobson v. Apfel*, 2001 WL 34368379, at *6 (D. Del. Feb. 28, 2001).

Jones argues that she was an unrepresented claimant with a mental disorder, and thus the ALJ had a heightened duty to fully develop the record. (D.I. 14 at 4) Jones does not dispute that she was informed of her rights and that she knowingly and intelligently waived her right to counsel. (D.I. 19 at 8) Jones fails to point to any specific examples in which the ALJ failed to assist Jones to develop the record. In contrast, the record reflects the ALJ accepted new medical records into evidence and directed the Agency to request updated records which were subsequently provided to Jones and added to the record. (Tr. at 19)

Jones argues that the ALJ failed to develop the record with respect to her work activity and therefore failed to conduct the necessary analysis to determine whether such work was substantial gainful activity. (D.I. 14 at 13-14) Earnings derived from work activity are generally the primary consideration in evaluating whether such work is substantial gainful activity. *See* 20 C.F.R § 404.1574(a)(1). The Third Circuit has recognized that "[i]f a claimant's earnings exceed guidelines set out in the regulation, a presumption arises that the claimant is engaged in substantial gainful activity." *Beeks v. Commissioner of Social Security*, 363 F. App'x 895, 897

15

(3d Cir. 2010). A claimant can rebut this presumption by showing that her work is done under special conditions. *Id.* (citing 20 C.F.R. § 416.973(c)). Such "special conditions" include: (1) requiring and receiving special assistance from other employees in performing work; (2) being allowed to work irregular hours or take frequent rest periods; (3) being provided with special equipment or assigned work specially suited to an impairment; (4) being able to work only because of specially arranged circumstances; (5) being permitted to work at a lower standard of productivity or efficiency than other employees; or (6) being given the opportunity to work because of a family relationship, past association with an employer, or an employer's concern for the individual's welfare. *See* 20 C.F.R. § 416.973(c).

The ALJ noted that when Jones worked during the period between June 30, 2013 and September 10, 2014, she earned approximately $4,285 per month in 2013 and $3,134 per month in 2014. (Tr. at 22) The ALJ contrasted these earnings with the SGA earnings cap, which was $1,040 per month in 2013, and $1,070 in 2014. (*Id.*) The ALJ properly noted that these earnings are in excess of the SGA cap and coupled with Jones's statements regarding her work, support a finding of substantial gainful activity. (*Id.*) Jones has produced no evidence of any special conditions that would rebut the presumption of substantial gainful activity. Therefore, the ALJ's decision is supported by substantial evidence.

## 2. The ALJ's Credibility Determination

Credibility determinations are in the province of the ALJ and a reviewing court ordinarily defers to an ALJ's credibility determination. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003); *Metz v. Fed. Mine Safety & Health Review Com'n*, 532 F. App'x 309, 312 ("Overturning an ALJ's credibility determination is an extraordinary step, as credibility determinations are entitled to a great deal of deference." (internal quotations omitted)).

Jones argues that the ALJ's rejection of her subjective complaints as "non-credible" is not supported by substantial evidence. (D.I. 14 at 10) Jones's arguments largely relate to the effectiveness of or weight the ALJ afforded certain pieces of evidence.

### i. Work-Related Abilities

Jones contends that the ALJ placed too much weight on her ability to engage in work-related activities such as driving, and failed to question the frequency with which she was able to drive. (*Id.* at 11) The ALJ determined that Jones is not as limited as alleged based on a review of her work history and work-like activities. (Tr. at 30-33) First, the ALJ noted that Jones underwent knee surgery in late 2014, and yet she worked with presumably even worse symptoms from June 30, 2013 to September 10, 2014. (*Id.* at 32, 393) The ALJ mentioned work-like activities such as driving a vehicle and going out shopping. (*Id.* at 32)

The record provides substantial evidence to support the ALJ's finding here. When answering questions regarding activities of daily living in February 2013, Jones described how she can prepare her own meals, drive a car, shop in stores, and go to church. (*Id.* at 290-291) She noted that she only shops in stores once per month for 30 minutes at most. (*Id.* at 291) Additionally, she stated that her legs hurt while she was driving. (*Id.* at 260) The ALJ remarked: "[g]iven that the claimant proved she was able to work despite similar (if not greater) medical problems, this history raises an obvious question regarding why she was not medically able to work throughout the broader period." (*Id.* at 32) Combined with Jones's activities of daily living, it is recommended that the court find that the ALJ's credibility determination was supported by substantial evidence.

17

### ii. Nursing Boards

Jones argues that the ALJ did not question her regarding her care for an ALS patient and her attempts to take the nursing boards. However, there is substantial evidence to support the ALJ's determination that such activities demonstrate a level of concentration, persistence, pace, and social and physical functioning. (D.I. 14 at 11-12; Tr. at 31) A May 25, 2012 medical record notes that Jones stated she cared for that patient approximately six hours per day, and would study for her nursing boards while with the patient. (Tr. at 540) Jones argues that she made a "sporadic and unsuccessful attempt[] to obtain a nursing license." (D.I. 14 at 12) However, it is recommended that the court find that there is substantial evidence to support the ALJ's conclusion that this activity was indicative of "impressive concentration, persistence, pace, and social and physical functioning." (Tr. at 31)

### iii. Dr. Waid's Opinion

Discussion of Dr. Waid's opinion is discussed at § IV.B.3.ii, *infra.*

### iv. "Conservative Treatment" & Appropriate Alternative Evidence of Inability to Afford Treatment

Jones argues that the ALJ repeatedly refers to her treatment as "conservative," but alleges that an ALJ must not only consider whether a claimant's treatment is conservative, but also whether such conservative treatment was effective. (D.I. 14 at 11) Jones cites no authority for this proposition. (*See id.*) Jones further states that she attempted conservative treatment, but such treatment was ineffective, leading to a total knee replacement on her left knee. (*Id.*) The ALJ did not ignore the fact that Jones received a total knee replacement, but reviewed this procedure during the hearing and in his decision. (Tr. at 31-32, 55-56)

Jones argues her financial situation prevented her from receiving greater treatment and the ALJ erred in finding her unpersuasive due to the "lack of evidence" of her inability to afford

such treatment. (D.I. 14 at 10-13) Jones contends the record is rife with evidence that she was financially unable to pursue more vigorous treatment, but the ALJ improperly requested specific types of evidence (*Id.* at 13) The ALJ did not ignore the evidence regarding Jones's financial inability to afford more medical treatment, but acknowledged that it was a factor that "[could] mitigate what would otherwise be the negative implications of missing or minimal treatment." (Tr. at 33) The ALJ identified examples of "appropriate alternative evidence" as: "some combination of need-based insurance/financial/coverage-appeal paperwork (including proof of what is needed, why, and why it cannot be given), commensurate use of 'free'/emergency facilities, commensurate activities (e.g., not working or attending nursing school), commensurate changes in treatment when there are wages or coverage, or even regular/commensurate complaints in the existing treatment record." (*Id.*)

Jones cites SSR 96-7p to bolster her assertion that an ALJ "must not draw any inferences about an individual's symptoms from a failure to pursue regular medical treatment without first considering any explanation."[5] (D.I. 19 at 4-5) She states that her inability to afford treatment is well documented, citing reports to the Social Security Administration ("SSA") and repeated

---

[5] SSR 16-3p rescinded and superseded SSR 96-7p. (*See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017)) SSR 16-3p is similar to SSR 96-7p in that it states:

> We will not find an individual's symptoms inconsistent with the evidence in the record on [the basis of failing to follow prescribed treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

(*See id.*). SSR 16-3p further notes that an ALJ can consider the individual's ability to perform work-related activities, in addition to the individual's inability to afford treatment or access free or low-cost medical services. (*See id.*).

19

statements to her doctors. (D.I. 14 at 12-13; Tr. at 260, 407, 511, 554, 594, 860, 884) Here, however, the ALJ's determination that Jones was not disabled was not based on Jones's conservative treatment, which was demonstrated as effective care in the medical records. (Tr. at 34) The fact that the ALJ was not persuaded by Jones' financial excuse for not seeking more treatment does not constitute reversible error. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (finding no reversible error where the ALJ's determination that claimant was not disabled was not based on a finding of noncompliance resulting from claimant's financial condition).

### 3. Residual Functional Capacity Assessment

#### i. Mental Limitations

Jones argues that the ALJ erred by failing to include mental limitations in his hypothetical to the VE, thereby failing to consider this limitation in determining her residual functional capacity. (D.I. 14 at 6) The Third Circuit has held that "[a] hypothetical question must reflect *all* of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (internal quotations omitted) (emphasis in original) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). In *Ramirez*, the court found that the ALJ's hypothetical that excluded the plaintiff's limitations regarding concentration, persistence, or pace, was deficient. *Id.* at 554. However, the Third Circuit also recognized that an ALJ may have a valid explanation for omitting mental limitations from his or her hypothetical, such as finding the deficiency in pace was "so minimal or negligible that, even though [the claimant may] suffer[] from this deficiency, it would not limit her ability to perform simple tasks under a production quota." *Id.* at 555.

20

The VE testified that the job of phlebotomist has a specific vocational preparation ("SVP") of three, indicating semi-skilled work with a light exertional level. (Tr. at 66) Semi-skilled work requires "alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. § 404.1568(b). Jones argues that *any* deficiencies in concentration, persistence, or pace could substantially affect her ability to perform work at a semi-skilled level. (D.I. 14 at 5)

Here, the ALJ did not include Jones's "mild limitation" on concentrating, persisting, or maintaining pace. (Tr. at 25, 66-67) The court in *Ramirez* noted that an ALJ may exclude mental limitations in his or her hypothetical to the VE if the evidence of such mental limitation was negligible based on the record. *Ramirez*, 372 F.3d at 555. Substantial evidence supports the ALJ's non-severe mental impairment finding. The ALJ's residual functional capacity assessment reflects the degree of limitation he found in the "paragraph B" mental function analysis.

Contrary to Jones' claims, the ALJ performed a thorough review of the medical records, the Agency consultants' assessments, Dr. Waid's report and the plaintiff's statements, and included all limitations he found credible in his RFC finding. The ALJ considered the four broad areas of mental functioning known as the "paragraph B" criteria and found no limitations in three areas and mild limitation in one:

- The first functional area is understanding, remembering, or applying information. In this area, the claimant has no limitation.

21

- The next functional area is interacting with others. In this area, the claimant has no limitation.
- The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has mild limitation.
- The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation.

(Tr. at 25) The ALJ explained that the limitations identified in the "paragraph B" criteria are not the RFC assessment but are rating criteria used in steps two and three. The RFC assessment in step four reflects the degree of limitation he found in the "paragraph B" mental function analysis.

The ALJ considered Jones' description of her depression, which included insomnia, fatigue, distraction, memory loss and mood fluctuations, among other symptoms. (*Id.* at 25) The ALJ noted support in the medical records for the symptoms described. (*Id.*) The records refer to a diagnosis of a type of depressive disorder managed in some instances with medication. (*Id.*) He noted overlap between Jones' mental and physical allegations, noting that physical impairments can aggravate mental problems. (*Id.* at 24) The ALJ found support lacking in the medical records to describe any mental limitations as "severe." (*Id.* at 27) Jones had no standard treatment with a specialized mental health care practitioner and the records disclosed that treatment "generally involved little more than routine and infrequent medication management through a general provider." (*Id.* at 26)

The ALJ gave little weight to the March 11, 2011 opinion of the consultative examiner, William Waid, Ph.D., who found severe impairments in most of Jones' work- related areas due to memory difficulties and depression. (*Id.* at 26-27) The ALJ noted that the examination overlapped with the period governed by *res judicata.* (*Id.*) Jones' subsequent treatment history was consistent with fewer depressive disorder symptoms and limitations. Importantly, in the

relevant time frame following Dr. Waid's evaluation, Jones was capable of employment for several months. (*Id.* at 31)

The ALJ gave great weight to the State agency psychological assessments. (*Id.* at 26) The ALJ found they were consistent with the conservative treatment documented in the medical records. (*Id.*) The findings of the Agency consultants support mild decrease in mental function which is not severe. (*Id.*)

The ALJ found the non-severe mental health impairment assessment was further supported by non-medical factors such as Jones' subsequent employment and her efforts to study for the skilled nursing license examination. (*Id.* at 25-26) Her activities of daily living included managing her finances, driving a car and attending church services. (*Id.* at 26) Accordingly, substantial evidence supports the ALJ's conclusion that "because the claimant's medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))." (*Id.* at 27) Thus, the degree of mental impairment as non-severe and requiring no additional limitations, was thoroughly considered as part of the ALJ's assessment of Jones' RFC.

The court recommends denying Jones' request to remand for further consideration of her mental limitations on her ability to perform her past relevant semi-skilled work.

## ii. Dr. Waid's Opinion

Jones asserts the ALJ improperly dismissed Dr. Waid's opinion. (D.I. 14 at 12) However, the ALJ did not disregard Dr. Waid's opinion by giving it little weight. (Tr. at 31-32) The ALJ noted Dr. Waid's "examination overlap[ped] with the period governed by *res judicata*" and "pre-date[d] significant evidence that supports fewer usual problems, such as the recent work activity and the typically benign objective findings despite conservative treatment." (*Id.* at 26-

23

27) Dr. Folkers noted that while Dr. Waid reported significant depression and hallucinations, there has been no evidence of this level of severity since. (*Id.* at 76) In fact, she reported improvement in May 2012 and has reported only occasional depression. (*Id.* at 76-77) Clinical records from February 2013 show that Jones had no mental health complaints. (*Id.*) The court recommends finding that substantial evidence supports the ALJ's decision to give little weight to Dr. Waid's opinion.

Jones argues that by rejecting Dr Waid's report, the ALJ impermissibly substituted his own lay judgment for the opinions of medical experts. (D.I. 14 at 6-7) An ALJ is not bound to accept the opinion of a medical expert, but may weigh the medical evidence and draw its own inferences. *Kertesz v. Crescent Hills Coal Co.*, 788 F.2d 158, 163 (3d Cir. 1986); *see also Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). However, the ALJ may not exercise absolute discretion to credit and discredit the expert's medical evidence, or to substitute his own lay judgment for the opinions of a medical expert. *Kertesz*, 788 F.2d at 163. Here, the ALJ did not discredit Dr. Waid's opinion nor substitute this opinion with his own lay judgment. As the ALJ noted, "I will not discount his diagnoses, because, as they say, 'he's the doctor.'" (Tr. at 32) The ALJ gave little weight to the report by Dr. Waid because he believed Jones reported incomplete information to Dr. Waid, and Dr. Waid's "examination overlap[ped] with the period governed by *res judicata*," "pre-dat[ing] significant evidence that supports fewer usual problems." (*Id.* at 26-27, 31-32) For these reasons, I recommend that the court deny Jones' request for remand on this subject because the ALJ was within his authority to assign little weight to Dr. Waid's opinion.

#### 4. Manipulative Limitations Finding

At step five, the Commissioner has the burden of determining whether the claimant is capable of performing "other work" that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In determining what type of work the claimant is capable of performing, the Commissioner relies on the DOT, the testimony of the VE, and the SSA's regulations and policies. *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014). "The DOT is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job." *McHerrin v. Astrue*, 2010 WL 3516433, at \*3 (E.D. Pa. Aug. 31, 2010).

In general, "occupational evidence provided by a VE should be consistent with the occupational evidence presented in DOT." *Zirnsak*, 777 F.3d at 617. Where the testimony of VE is inconsistent with the DOT, the ALJ is required to: (1) ask, on the record, whether the VE's testimony is consistent with the DOT; (2) "elicit a reasonable explanation" where an inconsistency does appear; and (3) explain in its decision "how the conflict was resolved." *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002). Remand is appropriate where the ALJ fails to resolve the conflict between the VE's testimony and the DOT and no other substantial evidence supports the ALJ's determination. *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005).

When asked whether a hypothetical individual would be able to conduct past relevant work as a phlebotomist, the VE testified that the past work would not be available to the hypothetical individual, because "the past work would require frequent – I'm sorry, constant fingering." (Tr. at 67) Jones avers that there is a conflict between the VE's testimony that the past work requires "constant fingering," and the DOT's requirement of "frequent fingering." (*Id.*

at 36) Jones further argues that the ALJ noted this discrepancy but improperly concluded that the VE's testimony was "a simple misreading of the indicated DOT code" and adopted the "frequent fingering" standard in DOT's code. (D.I. 14 at 9; Tr. at 36) The ALJ further concluded that if the correct job requirement was used, the past relevant work would have been available according to VE. (Tr. at 36) Jones argues that the ALJ did not ask the VE about the conflict between her testimony and the DOT regarding this inconsistency. (D.I. 14 at 9)

The ALJ informed the VE at the hearing that if there was any information in conflict between her testimony and the DOT, the VE must notify the ALJ of the conflict and explain the basis of her opinion. (Tr. at 65) At the conclusion of the hearing, the ALJ also asked the VE to confirm that her testimony was consistent with the DOT, and the VE assured the ALJ that it was, with the exception of the "sit/stand" option in his hypothetical. (*Id.* at 68)

Although the ALJ asked the VE if her testimony was consistent with the DOT and she answered affirmatively, a conflict still remains. The ALJ recognized this inconsistency in his decision and "resolved" it by accepting the DOT's description and citing to SSR 00-04p. (*Id.* at 36) As such, the ALJ did not obtain a "reasonable explanation," nor resolve the conflict between the information in the DOT and the VE's testimony regarding the standard of fingering required to perform the past relevant work.[6] *See Burns*, 312 F.3d at 127; *Walker v. Astrue*, 2010 WL

---

[6] Jones argues that the ALJ's rejection of the opinion of the state agency physician, Dr. Singh, lacks medical support and thus warrants remand for further evaluation. (D.I. 14 at 8) Dr. Singh rated Jones's manipulative limitations for handling and fingering as "limited" on the right side. (*Id.* at 112-113) Dr. Singh noted that Jones added an allegation of arthritis in her right hand, her dominant hand, with her right thumb popping in and out of its joint. (*Id.* at 114) The ALJ recognized that other medical evidence supported "a somewhat different degree and distribution of limitations" than those described in Dr. Singh's opinion. (*Id.* at 34) The ALJ reasoned that Dr. Singh's opinion was submitted before Jones demonstrated "greater exertional and manipulative abilities" by returning to work and engaging in work-like activities, such as driving and shopping. (*Id.*) However, Dr. Singh's report is dated May 6, 2014, which was *during* the period that Jones temporarily returned to work as a phlebotomist. (*Id.* at 114) Jones's testimony

26

3167557, at *6 (E.D. Pa. 2010). SSR 00-04p specifically describes how neither the VE's opinion, nor the DOT automatically "trumps" the other in the context of a conflict in occupational information. (SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)) Instead, the adjudicator must determine whether the VE's opinion is reasonable and then provide a basis for relying on the VE's testimony or the DOT information. (*Id.*) The ALJ did not provide sufficient requisite reasoning as to why he accepted the DOT's description. Therefore, it is recommended that the court remand, in part, to address the above inconsistency.

## V. CONCLUSION

The court recommends granting-in-part and denying-in-part Jones' motion for summary judgment (D.I. 13), and granting-in-part and denying-in-part the Commissioner's cross-motion for summary judgment (D.I. 17). The court further recommends the case be remanded to the Commissioner with instructions to identify and resolve any conflicts between the occupational evidence provided by the VE and information in the DOT regarding the frequent or constant fingering requirement for the past relevant work as a phlebotomist.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

---

does not demonstrate greater manipulative abilities, as the ALJ contends. (*Id.* at 34) Thus, the ALJ's finding regarding Jones's manipulative limitation is not supported by substantial evidence, and remand is recommended to clarify the conflict between the VE opinion and the DOT.

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: February 6, 2019

Sherry R. Fallon
United States Magistrate Judge